(February 16, 1904.)

## CURTIS, ADMINISTRATOR, v. KIRKPATRICK.

[75 Pac. 760.]

MENTAL CAPACITY—WHEN COMPETENT TO TRANSACT BUSINESS—UNDUE
INFLUENCE—FINDINGS OF THE COURT WILL NOT BE DISTURBED
WHEN—INTOXICATING LIQUORS—SPIRITUALISM.

1. When it is shown that the party conveying property by warranty deed, or executing and delivering a mortgage on property, understood and knew the nature and effect of such conveyances, at the time of their execution, he is competent to make such conveyances.

2. Undue influence must be shown to have existed at the time of the execution and delivery of the instrument complained of, or it will not be set aside or canceled in a court of equity.

3. Excessive use of intoxicating liquors is not alone sufficient to disqualify one from transacting business, or conveying real estate, unless it be shown that at the time of the transaction he did not fully understand the nature of the transaction.

4. The fact that one is a believer in spiritualism and makes many statements apparently unreasonable is not evidence of insanity.

5. Findings of a jury in an equity case are only advisory, and may be adopted, or amended and adopted as the findings of the court, or the court may make its findings independent of the findings of the jury.

(Syllabus by the court.)

JUDGMENT for respondent, defendant below, from which plaintiff below, appellant here, appeals. Judgment affirmed.

The facts are stated in the opinion.

F. S. Dietrich and E. E. Chalmers, for Appellant.

A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determiend, is subject to rescission. (Idaho Rev. Stats., sec. 2411.) One who deals in property matters with an aged and feeble person is bound to prove the fairness of the transaction. (Bigelow on Fraud, 282; *Wartemberg v. Spiegel,* 31 Mich. 400; *Ellis v. Mathews,* 19 Tex.

390, 70 Am. Dec. 353.) Equity will set aside a contract for the sale of real estate and a conveyance thereunder when it appears that the capacity for business on the part of the grantor has been greatly weakened by trouble and distress of mind, and the price was grossly inadequate. (Bigelow on Fraud, p. 283; *Perkins v. Scott,* 23 Iowa, 237.) Where inadequacy of consideration or undue influence is joined to imbecility or weakness of mind, arising from old age, sickness, intemperance, or other cause, equity will set aside the transaction at the suit of the injured party. (Bigelow on Fraud, p. 283, et seq.; *Tracey v. Sacket,* 1 Ohio St. 54, 59 Am. Dec. 610; *Crawford v. Hoeft,* 58 Mich. 1, 23 N. W. 27, 24 N. W. 645, 25 N. W. 567, 26 N. W. 870; Cooley on Torts, 515, 516; *Oakey v. Ritchis* 69 Iowa, 69, 28 N. W. 448; *In re Disbrow's Estate,* 58 Mich. 96, 24 N. W. 624.) Where the insanity is known to the other party to the contract, or where he has information such as would lead a prudent man to such knowledge, the contract is invalid. (*Lincoln v. Buckmaster,* 32 Vt. 652; *Henry v. Fine,* 23 Ark. 417; *Matthiessen etc. Co. v. McMahon,* 38 N. J. L. 536; *Lancaster etc. Bank v. Moore,* 78 Pa. St. 407, 21 Am. Rep. 24.) Whenever there is a great weakness of mind, arising from age, sickness or other cause, in a person executing a conveyance of land, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, transfer and set the conveyance aside. (*Allore v. Jewell,* 94 U. S. 506, 24 L. ed. 260, and notes; *Fisher v. Bishop,* 108 N. Y. 25, 2 Am. St. Rep. 357, 15 N. E. 331, and notes; *Moore v. Moore,* 56 Cal. 89; *Scovill v. Barney,* 4 Or. 288; *Archer v. Lapp,* 12 Or. 196, 6 Pac. 672; *Carnagie v. Diven,* 31 Or. 366, 49 Pac. 891; *Klose v. Hillenbrand,* 88 Cal. 473, 26 Pac. 353.)

N. H. Clark, S. J. Rich, John A. Bagley and K. I. Perky, for Respondent.

There being no evidence that Garrett was intoxicated at the time of the execution of the deed, but it appearing, on the contrary, that he knew what he was doing, and the effect of his

act, the vital inquiry is as to his capacity, not when he was intoxicated, but when the deed was executed, and under this rule the contention of appellant should be denied. (*Conley v. Nailor,* 118 U. S. 127, 6 Sup. Ct. Rep. 1001, 30 L. ed. 112; *Ralston v. Turpin,* 129 U. S. 663, 9 Sup. Ct. Rep. 420, 32 L. ed. 747.) Occasional insanity arising from intemperance does not affect a contract made by a subject while in possession of his faculties. (*Lewis v. Baird,* 3 McLean, 56, Fed Cas. No. 8316; *Bliss v. Connecticut etc. R. R. Co.,* 24 Vt. 424.) Mere drunkenness of itself does not disqualify a man from making contracts, unless it exists to such a degree as to deprive him of his reason, and render him incapable of giving a true consent. (*Pickett v. Sutter,* 5 Cal. 412; *Wright v. Waller,* 127 Ala. 557, 29 South. 57; *Bates v. Ball,* 72 Ill. 108; *Wilcox v. Jackson,* 51 Iowa, 208, 1 N. W. 513; *Wright v. Fisher,* 65 Mich. 275, 8 Am. St. Rep. 886, 32 N. W. 605; *Cavender v. Wadingham,* 5 Mo. App. 457; *Parker v. Marco* (C. C.), 76 Fed. 510; *Worthington v. Worthington* (Md. App.), 20 Atl. 911; *Van Wyck v. Brasher,* 81 N. Y. 260; *Noel v. Karper,* 53 Pa. St. 97; *Ritter's Appeal,* 59 Pa. St. 9; *Conant v. Jackson,* 16 Vt. 335.) A belief in spiritual manifestations and in having had communication with deceased persons is not necessarily evidence of such a disordered mental condition as to make one incompetent to make a conveyance of real estate. (*Lewis v. Arbuckle etc.,* 85 Iowa, 335, 52 N. W. 237, 16 L. R. A. 677; *Robinson v. Adams,* 62 Me. 369, 16 Am. Rep. 473, and authorities cited in note to *Lewis v. Arbuckle; Otto v. Doty,* 61 Iowa, 23, 15 N. W. 578; *Brown v. Ward,* 53 Md. 376, 36 Am. Rep. 422; *La Bau v. Vanderbilt,* 3 Redf. (N. Y.) 384. See note, 16 L. R. A. 678.) We submit that the evidence was sufficient to warrant the verdict and judgment in this case, and again call attention to the fact that the evidence is conflicting upon the question of competency, having been disposed of by the court, and should not be interfered with by the appellate court. (*Kelly v. Perrault,* 5 Idaho, 221, 48 Pac. 45.) The rule in this class of cases is, Had the contracting party sufficient mental capacity to reasonably understand the value and effect of what he was doing? (*Trimbo v. Trimbo,* 47 Minn. 389, 50 N. W. 350; *Aiman v.*

*Stout,* 42 Pa. St. 114; *Frances v. Wilkinson,* 147 Ill. 370, 35
N. E. 150; *Meeker v. Meeker,* 75 Ill. 260; *Trish v. Newell,* 62
Ill. 197, 14 Am. Rep. 79; *Carpenter v. Calvert,* 83 Ill. 62;
*Pickerell v. Morss,* 97 Ill. 220; *Stone v. Wilburn,* 83 Ill. 105;
Redfield on Wills, 98-100; *English v. Porter,* 109 Ill. 285; *Argo
v. Coffin,* 142 Ill. 368, 34 Am. St. Rep. 86, 32 N. E. 679; *Whit-
ney v. Townbly,* 136 Mass. 145.)    To raise a presumption of
undue influence, inadequacy of consideration must be so gross
that it shocks the conscience. (*Shaddle v. Disbrough,* 30 N.
J. Eq. 370; *Erwin v. Parham,* 12 How. (U. S.) 197, 13 L.
ed. 952; *Bowman v. Patrick* (C. C.), 36 Fed. 138; *Galloway v.
Barr,* 12 Ohio, 354; *Tabott's Devisees v. Hooser,* 12 Bush
(Ky.), 408; *Conaway v. Sweeney,* 24 W. Va. 643; *Conrad v.
Schwamb,* 53 Wis. 372, 10 N. W. 395; note to *Jackson v. King,*
15 Am. Dec. 362, citing *Creagh v. Blood,* 2 Jones & L. 509.)
It is well settled, therefore, that unless there is inadequacy of
consideration, or some other evidence of fraud, imposition or
overreaching, any degree of imbecility or insanity short of total
business incapacity will not suffice to avoid a contract.    (Note
to *Jackson v. King,* 15 Am. Dec. 363, and authorities cited.)
The court did not err in adding to the answers to questions 26,
31, 41 of the findings of the jury before he adopted such find-
ings of the court.    The verdict was merely advisory to the
court.    (*Kelly v. Perrault,* 5 Idaho, 221, 48 Pac. 45; *Daley v.
Josselyn,* 7 Idaho, 657, 65 Pac. 442; 11 Ency. of Pl. & Pr. 302.)
As to the weight to be given to the testimony of an expert wit-
ness as against those personally acquainted with the party and
the transaction.    (*Ruthford v. Morris,* 77 Ill. 397; *Burley v.
McGough,* 115 Ill. 11, 3 N. E. 738; *Guild v. Hull,* 127 Ill.
523, 20 N. E. 665; *Richenbach v. Ruddach,* 127 Pa. St. 564,
18 Atl. 432.)    Influence through affection, etc., will not avoid
a deed.    (*Burt v. Quisenberry* 132 Ill. 385, 24 N. E. 622;
*Children's Aid Soc. v. Loveridge,* 70 N. Y. 387; *Hale v. Cole,*
31 W. Va. 576, 8 S. E. 516; *Nicholas v. Kerschner,* 20 W. Va.
251.)    Undue influence must not be the influence of attach-
ment, affection, etc., and must amount to force or coercion.
(*Goodwin v. Goodwin,* 59 Cal. 561; *Howe v. Howe,* 99 Mass.
88; *Carpenter v. Bailey,* 94 Cal. 406, 29 Pac. 1101.)    Undue

influence must destroy the will of the grantor completely, take away his wishes and thwart his purposes. (*Marx v. McGlynn,* 88 N. Y. 357.) So long as one possesses requisite mental faculties to transact rationally the ordinary affairs of life, he will not be relieved from the responsibility of the ordinary citizen. (*Titcomb v. Vantyle,* 84 Ill. 371; Devlin on Deeds, secs. 68, 69; *Baldwin v. Dunton,* 40 Ill. 188; *Hovey v. Chase,* 52 Me. 304, 83 Am. Dec. 514; *Galpin v. Wilson,* 40 Iowa, 90.)

STOCKSLAGER, J.—This is an appeal from the district court of Bingham county; defendant had judgment in the lower court; from the whole of the judgment the appeal is taken. Plaintiff, as the administrator of the estate of John Garrett, deceased, commenced his action to cancel and set aside a certain mortgage, dated the sixth day of November, 1895, and a deed from said Garrett to John E. Kirkpatrick, dated the tenth day of November, 1898, for the reason and upon the grounds that grantor, John Garrett, was incompetent to execute and deliver the said mortgage and deed. John Garrett was the grandfather of defendant, the grantee. A jury was selected and forty-three questions were submitted to them to be answered and returned to the court, and much to their credit, they waded through the long list and answered each one of them. Thereafter, and after argument of counsel, the court adopted the findings of the jury with certain amendments, which amendments counsel for appellant claim were not warranted by the evidence.

Question 26, as submitted to the jury, is as follows: "Did John Garrett, on the ninth and tenth days of November, 1898, when he directed John Montgomery, his attorney in fact, to make the deed in question to John E. Kirkpatrick, know what he was doing?" Answer: "Not fully."

Question 31 follows: "Was John Garrett on the tenth day of November, 1898, possessed of sufficient mental capacity to understand an ordinary business transaction?" Answer: "Not fully."

Question 41: "Was he possessed of sufficient mental capacity to understand the nature of the mortgage and the effect of its execution and delivery?" Answer: "Not fully."

To the answers returned by the jury to questions 26, 31 and 41, the court in its findings adds to each the following language: "But sufficient for the purpose of making a valid conveyance of the property described in said deed to grantee, John E. Kirkpatrick."

Twenty-eight errors are assigned by counsel for appellant, nearly all based on the theory that the evidence, taken as a whole, does not warrant the findings of the court that deceased, John Garrett, was mentally capable of executing and delivering the mortgage and deed to respondent. It is impossible to fully comprehend the issues involved and the facts upon which a judgment in this case was rendered without fully setting out the findings of the court which were the findings of the jury with the amendments heretofore referred to, which are as follows:

"Question 1. On the tenth day of November, 1898, at the time the deed in question was made, what was the age of John Garrett? Answer. Over 80 years of age. Q. 2. What relationship existed between John Garrett and the defendant? A. Grandfather to defendant. Q. 3. During the last five or six years of his life was John Garrett addicted to the use of intoxicating liquors, and to what extent? A. Yes, to excess. Q. 4. Was John Garrett during the last six or eight years of his life a firm believer in the doctrine of spiritualism? A. Yes. Q. 5. Did John Garrett during the last five or six years of his life suffer with hallucinations or delusions, i. e., did he believe that he saw and heard, entertained and enjoyed the company of persons who were not in fact physically present, and who did not, in fact, exist physically? A. Yes. Q. 6. Was John Garrett in his later years filthy or ordinarily cleanly in his person? A. Filthy. Q. 7. Was he filthy, or ordinarily cleanly in his household? A. Filthy. Q. 8. Did John Garrett in the last five or six years of his life accept the advice and follow the directions of supposed spirits against those of a practical surveyor or engineer, relating to the location of water ditches? A. Yes. Q. 9. Did John Garrett in the last five or six years of his life accept the advice and follow the directions of supposed spirits concerning the practical business af-

fairs of his life, and if so, to what extent? A. Yes, to a great extent. Q. 10. Did John Garrett in his earlier life accumulate considerable property and in his later years spend some of it, without knowing or being able to state what he had spent it for, and if so, to what extent? A. Yes, to a great extent. Q. 11. Was John Garrett in his later life as prudent and careful in his money and business affairs as he was in his earlier life? A. No. Q. 12. During the last five or six years of his life was John Garrett physically sound or decrepit and feeble? A. Decrepit and feeble. Q. 13. Did he then walk with a firm and steady step, or with a shambling or stumbling gait? State how he walked. A. With a shambling gait. Q. 14. What was the mental capacity of John Garrett during the last four or five years of his life? A. Impaired. Q. 15. Was John Garrett during the last four or five years of his life, and immediately preceding his death, capable and competent to manage and transact his more important business transactions? A. No. Q. 16. Were the intellectual faculties of John Garrett more acute, or less acute, in 1898 than in 1894 and 1895? A. Less acute. Q. 17. Were the intellectual faculties of John Garrett weakened or lessened between the years 1894 and January 1, 1899? A. Weakened and lessened. Q. 18. Did John Garrett at any time after 1895 possess the full use of his mental faculties? A. No. Q. 19. Was John Garrett at the time the deed in question was executed competent to transact his own important business affairs? A. No. Q. 20. Was the said John Garrett at the time of the execution and delivery of the deed, dated November, 1898, mentally capable of understanding the nature of his act and the effects of the same? A. No. Q. 21. Was said John Garrett made acquainted with the contents of said deed at the time of its execution and delivery? A. Yes. Q. 22. By whom was John Garrett's name to the deed in question signed? A. By John Montgomery's clerk. Q. 23. Did John Montgomery sign the name of John Garrett to the deed in question? A. No. Q. 24. Did John Garrett, on the ninth and tenth day of November, 1898, direct John Montgomery to execute the deed in question to John E. Kirkpatrick? A. Yes, on the 10th.

Q. 25. If so, what instructions did he give him? A. To transfer as it is described in the deed. Q. 26. Did John Garrett on the ninth and tenth day of November, 1898, when he directed John Montgomery, his attorney in fact, to make the deed in question to John E. Kirkpatrick, know what he was doing? A. Not fully, but sufficient for the purpose of making a valid conveyance of the property described in said deed to grantee, John E. Kirkpatrick. Q. 27. Did John Garrett, at that time, know what property he was conveying? A. Yes. Q. 28. Did he know to whom the property was being conveyed? A. Yes. Q. 29. Was it his desire and wish to convey the property in question to John E. Kirkpatrick? A. Yes. Q. 30. Did John Garrett at that time, understand the nature and effect, of the deed? A. Not fully. Q. 31. Was John Garrett on the tenth day of November, 1898, possessed of sufficient mental capacity to understand an ordinary business transaction? A. Not fully, but sufficient for the purpose of making a valid conveyance of the property described in said deed to grantee, John E. Kirkpatrick. Q. 32. What was the consideration paid by John E. Kirkpatrick to John Garrett for the property in question, if anything? A. $650. Q. 33. Did John Garrett on the tenth day of November, 1898, give any reasons to his attorney in fact, John Montgomery, for making the deed in question, other than the money consideration? A. Yes. Q. 34. If so, what reason did he give? A. That they had been good to him. Q. 35. Did John Garrett on or about the sixth day of November, 1895, execute and deliver to John E. Kirkpatrick a promissory note? A. Yes. Q. 36. What was the amount of and consideration of this note? A. Five hundred dollars ($500) with interest at ten per cent. Q. 37. On the sixth day of November, 1895, at the time John Garrett executed and delivered the mortgage referred to in the complaint to secure the payment of a note for $500 to John E. Kirkpatrick, did he know what property was covered by the mortgage? Yes. Q. 38. Did he know to whom the mortgage was given? A. Yes. Q. 39. Did he understand the nature and effect of the mortgage? A. Not fully. Q. 40. On the sixth day of November, 1895, at the time John Garrett exe-

cuted and delivered the said mortgage, was he possessed of sufficient mental capacity to understand the nature and effect of an ordinary business transaction? A. Not fully. Q. 41. Was he possessed of sufficient mental capacity to understand the nature of the mortgage and the effect of its execution and delivery? A. Not fully, but sufficient for the purpose of making a valid conveyance of the property described in said deed, to grantee, John E. Kirkpatrick. Q. 42. Was any part of the principal or interest evidenced and secured by said note and mortgage ever paid before making the deed? A. No. Q. 43. What was the value of the land and water in question on November 10, 1898? A. Twelve and one-half dollars ($12.50) per acre."

Many reasons are assigned why deceased, Garrett, was mentally incapacitated to make the conveyances in controversy. Old age; his firm belief in spiritualism; excessive use of intoxicating liquors; the loss of his wife a few years before the execution of the conveyances—are all urged as reasons for unbalancing his mind and rendering him incapable of knowing and fully understanding the effect of the conveyances. A great volume of evidence is before us of persons who were well acquainted with deceased for a number of years before his death. We have the evidence of Dr. J. W. Givens, superintendent of the asylum for the insane at Blackfoot, as an expert on the subject of insanity. Then we have the evidence of those who were acquainted with his daily habits. We do not feel justified in referring to this evidence very extensively in this opinion, for the reason of the well-established rule that when a case comes to this court on appeal from a judgment, based upon disputed facts in the lower court either where the trial was with or without a jury, the judgment will be affirmed. As has been so often said by the courts of last resort, the trial court has many opportunities to see and know things connected with the trial that cannot be brought to this court in the record; they have the opportunity of observing the manner and conduct of the witnesses and their means of information; all evidence looks alike on paper and then, under the rules, we get it in an abbreviated form. The district courts are the trial courts for ac-

tions of the character under consideration. Thus, unless it
is very plain that the judgment is fatally defective for
want of sufficient evidence to sustain it, it should not be
disturbed in this court. With these views we have carefully
examined the evidence in the case at bar, and find many con-
flicts as to the physical and mental condition of deceased Gar-
rett, dating from the early settlement of the country surround-
ing Blackfoot up to the time of his death. One witness tes-
tifies to an acquaintance with him dating back to 1863, and
numbers of them, for both plaintiff and defendant, testifying
to an acquaintance dating back twenty or more years. It is
shown by the evidence, beyond controversy, that in the later
years of his life he was addicted to the use of intoxicating
liquors to excess; that he was a firm believer in spiritualism;
made many statements as to conversations with spirits; promi-
nent were Cleopatra and Socrates, and claimed that his com-
pany was from the spirit world; that they, naming many of
them, were frequently his visitors, and that he was never lone-
some for this reason.

This may be considered evidence of insanity by some and by
others as a high order of intelligence and advancement in re-
ligion or science. It is shown that he was an educated man,
and read other books than those treating on the subject of
spiritualism—in fact, was what is termed a great reader—did
not ignore politics, and was informed on and ready to discuss
the current events of the times. It is also shown by the evi-
dence of Mr. Gagon, who took his acknowledgment to the mort-
gage, that he believed him capable of knowing and fully under-
standing the nature of the transaction. Also by the evidence
of Mr. Montgomery, who was his attorney in fact at the time
of the execution of the deed, that he believed he fully under-
stood the transaction; and by the evidence of Mr. George L.
Wall, who took his acknowledgment, to the power of attorney
appointing Norman Jones his attorney in fact, Mr. Wall says:
"I explained to him what it was and he said he knew what it
was, a power of attorney firing J.—— S.—— and giving Nor-
man Jones charge of his affairs, or words to that effect."
Frank W. Beane testifies to business transactions and conversa-

tions with deceased, some of them but a short time, about three weeks, before his death and pronounced him sane. On the other hand, a number of witnesses, who had known deceased as long and as intimately as those who testify to his sanity, are of the opinion that he was incapable, by reason of his mental condition, of transacting business for himself or of fully knowing and comprehending the nature and effect of the execution and delivery of the mortgage and deed to respondent. Dr. J. W. Given testifies as an expert on the subject of insanity. He is a recognized authority on this subject, not only in this state, but wherever he is known, and his evidence necessarily carries much weight with the court and jury.

It will be observed that his answers were based upon the testimony of other witnesses and hypothetical questions, and not upon any knowledge or experience with the deceased. We have said the evidence on the material issues involved in this case was very conflicting. We find it so much so that we do not feel that we would be justified in saying that the findings of the court should be set aside and a new trial granted on this account.

Counsel for appellant in the oral argument relied on *Allore v. Jewell*, 94 U. S. 506, 24 L. ed. 260. This was a case where an old, feeble woman conveyed her property to a stranger on certain conditions of payment, and before any payments of consequence were made she died. It was shown that when she made and delivered the deed no one was present except the grantee, his agent and his attorney. The property was worth at the time of the conveyance between $6,000 and $8,000. It is said in this case: "In November, 1863, the defendant obtained from her a conveyance of this property. A copy of the conveyance is set forth in the bill. It contains covenants of seisin and warranty by the grantor, and immediately following them an agreement by the defendant to pay her $250 upon the delivery of the instrument; an annuity of $500; all her physicians' bills during her life; the taxes on the property for that year, and all subsequent taxes during her life; also that she should have the use and occupation of the house until the spring of 1864, or that he would pay the rent of such other

house as she might occupy until then. The $250 stipulated were paid; but no other payment was ever made to her. She died in a few weeks afterward."

The opinion then discusses the evidence as to the habits of deceased, certainly showing a much worse condition of mind than is shown of the deceased in the case at bar. It was not shown that the defendant—respondent—ever attempted to exert undue influence over the deceased, Garrett, or asked him to make the deed. He says, and it is not contradicted, that he wanted his money due him on the mortgage, but that his grandfather insisted on giving him the deed. It is shown that Mr. Montgomery, who was attorney in fact for deceased at the time of the execution of the deed, refused to make it when he was first requested to do so by the deceased, and on the next day deceased came back and insisted that the deed should be made, and when asked for his reasons, said they had been good to him—evidently meaning the Kirkpatrick family. From this evidence it is shown, not only that deceased knew just what he wanted done, but when asked gave his reasons for the course he was taking. Many authorities are cited by counsel for appellants to the effect that whenever there is a great weakness of mind arising from age, sickness or other cause, in a person executing a conveyance of land, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper showing and seasonable application of the injured party, or his representatives or heirs, annul and set the conveyance aside. We do not think this rule can be questioned, but under the facts as established in this case and the findings of the court largely depending on the findings of the jury, it does not come within this rule.

Counsel for respondent rely on the case of *Kelly v. Perrault,* 5 Idaho, 221, 48 Pac. 45. This opinion was written by Mr. Justice Quarles, concurred in by all the members of the court; it says: "There is absolutely no evidence in the record before us which shows that at the time the deed in question was executed the grantor was under undue influence, but, on the other hand, the evidence of the subscribing witnesses to the deed,

and of the witnesses to its delivery, as well as that of other witnesses, shows conclusively that the execution and delivery of the said deed was the free and voluntary act of the grantor, and made by him in pursuance of his preconceived determination to give the property conveyed by it to the grantee." It is urged by counsel for appellant that the instruction given by the court, to wit, "The opinion of an expert is not entitled to much weight, as against the testimony of persons who are familiar with the party and the transaction, and who testify as to the facts from which the competency of a grantor is to be determined." This instruction was copied from the language of the opinion in *Kelly v. Perrault,* and in support of this position that opinion cites *Rutherford v. Morris,* 77 Ill. 297, and *Burley v. McGough,* 115 Ill. 11, 3 N. E. 738. These three cases are very instructive on the question under consideration. The language may be strong, but we do not think it was error. A number of errors are assigned, but owing to the fact that it is stated in the brief of appellant that the question upon which this case must be determined is whether or not deceased, Garrett, was so incapacitated at the time he executed the deed as to render him incompetent to know the effect of his act, and all the evidence having been aimed at that feature of the case, we deem it unnecessary to pass thereon.

It is urged by counsel for appellant that if the court had adopted the findings of the jury, as they were returned, the judgment would have been in favor of appellant. The court had the right to adopt all the findings of the jury or any portion of them, or reject any or all of them and prepare its findings independent of theirs, and there was no error in the amendments to the findings of the jury complained of.

We find no error in the record, and the judgment of the trial court is affirmed. Costs are awarded to the respondent.

Sullivan, C. J., and Ailshie, J., concur.